IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

STEVEN MICHAEL CAPSHAW,      )
                             )
            Petitioner,       )
                             )
    v.                       )        Civil Action No. 1:12cv541-MEF
                             )                   (WO)
UNITED STATES OF AMERICA,     )
                             )
            Respondent.       )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the court on a motion by Steven Michael Capshaw ("Capshaw")

to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

## I.   INTRODUCTION

On April 16, 2010, a jury found Capshaw guilty of using or causing the use of a

facility of interstate commerce (a telephone) with intent to commit murder-for-hire, in

violation of 18 U.S.C. § 1958.  On December 2, 2010, the district court sentenced Capshaw

to 120 months in prison.

Capshaw appealed, raising the following claims in the Eleventh Circuit:

1.   The Government did not present sufficient evidence that,
     independent of Government intervention, he used a telephone in
     the commission of the offense.

2.   To the extent the Government established that he used a
     telephone, the jurisdictional element was "manufactured" by the
     Government.

3.   At sentencing, his offense level should not have been increased
     for obstruction of justice based on his trial testimony.

Ex. X at 1.[1]

On September 7, 2011, the Eleventh Circuit Court of Appeals issued an opinion affirming Capshaw's conviction and sentence. *United States v. Capshaw*, 440 F. App'x 738 (11th Cir. 2011). Capshaw filed a petition for a writ of certiorari in the United States Supreme Court, which that court denied on January 12, 2012. *Capshaw v. United States*, 132 S. Ct. 1121 (2012).

On June 19, 2012, Capshaw, proceeding *pro se*, filed a motion under 28 U.S.C. § 2255 asserting the following as grounds for relief:

    1.    His arrest on a criminal complaint deprived him of his right to due process, because–

        (a)    there was unnecessary delay in his being brought before a magistrate judge after his arrest; and

        (b)    the affidavit that was submitted in support of the criminal complaint contained a false statement.

    2.    His conviction was obtained through an unlawful search and seizure in violation of his Fourth Amendment rights, specifically through–

        (a)    an unlawful inventory search of his vehicle;

        (b)    an unlawful warrantless search of cell phone

---

[1] Unless otherwise indicated, references to exhibits are to those filed by the Government with its response, Doc. No. 10. Document numbers are those assigned by the Clerk in the instant civil action or, where applicable, in Capshaw's criminal proceedings, Case No. 1:09cr188-MEF. Page references are to those assigned by CM/ECF, except for (1) references to the trial and hearing transcripts ("TTr." & "HTr."), where page references are to those in the official record in Case No. 1:09cr188-MEF, and (2) references to document numbers in Case No. 1:09cr188-MEF, where page references are to those in the original documents.

records;

(c)    a false statement in the affidavit that was submitted in support of obtaining the warrant to search his residence;

(d)    an error in the address listed on the warrant to search his residence; and

(e)    the warrantless search of the contents of his wallet after his arrest.

3.    His counsel rendered ineffective assistance by–

(a)    failing to challenge his arrest on a criminal complaint based on the delay in his being brought before a magistrate;

(b)    failing to argue that the affidavit submitted in support of the criminal complaint contained a false statement;

(c)    failing to challenge the inventory search of his vehicle;

(d)    failing to challenge the warrantless search of his and other individuals' cell phone records;

(e)    failing to challenge the validity of the affidavit submitted in support of obtaining the warrant to search his residence and the erroneous address listed on the search warrant;

(f)    failing to properly impeach trial witnesses;

(g)    failing to challenge the authenticity of recordings admitted in evidence at trial;

(h)    failing to have him present during jury selection;

(i)     failing to object to the Government attorney's reference to post-arrest correspondence between Capshaw and his son;

(j)     failing to challenge the admission of a camouflage cap at trial;

(k)     failing to challenge the reasonableness of his sentence;

(l)     failing to obtain a plea agreement;

(m)    failing to object to *Brady* and *Giglio* violations by the Government;

(n)     failing to challenge the chain of custody as to evidence seized from his vehicle;

(o)     failing to adequately prepare for trial and pursuing a flawed strategy;

(p)     failing to obtain a transcript of his detention hearing for use to impeach witnesses at trial; and

(q)     "abandoning" him after the appeal process.

Doc. No. 1 at 3-20.[2]

On November 12, 2012, Capshaw filed an amendment to his § 2255 motion, asserting a claim that his right to a public trial was violated when jury selection was closed to the public.  Doc. No. 18.

The Government maintains that Capshaw's claims are either procedurally barred or without merit and that, consequently, he is not entitled to any collateral relief.  *See* Doc. Nos.

---

[2] For organizational and analytical purposes, the court has reordered some of Capshaw's claims or recast them in a more appropriate presentation.

4

10 & 20.  Capshaw has replied in opposition to the Government's submissions.  *See* Doc.

Nos. 13 & 22.  After due consideration of Capshaw's § 2255 motion, the submissions

supporting and opposing the motion, and the record in this case, the court concludes that an

evidentiary hearing is not required and that, pursuant to Rule 8(a), *Rules Governing Section*

*2255 Proceedings in the United States District Courts*, the § 2255 motion should be denied.

## II.   TRIAL EVIDENCE

Because an understanding of the factual background of this case is useful in

understanding some of Capshaw's present claims, this court quotes the summary of the

pertinent trial evidence set forth by the Eleventh Circuit in its opinion affirming Capshaw's

conviction.

> In August 2009, Defendant Capshaw's wife, Sandra Capshaw
> ("Sandra"), told him that she wanted a divorce and then moved out of the
> family home into an apartment.  Although Capshaw had very infrequent
> contact with his sister, Karen Whitaker, Capshaw called Karen in early
> October 2009 and asked to meet her at the Farm Center.  Karen then called her
> daughter (and Capshaw's niece), Nathina Whitaker, and asked her to be at the
> Farm Center meeting too.
>
> At the meeting, Defendant Capshaw told his sister Karen that he and his
> wife Sandra were getting a divorce and that he wanted his wife taken out of the
> picture.  At some point, Karen's daughter, Nathina, arrived.  Karen explained
> to Nathina that Defendant Capshaw wanted to kill his wife and asked Nathina
> whether she knew anyone who would do it, or if she would be willing to do it
> herself.
>
> There is conflicting evidence as to whether Nathina agreed to
> participate in the plot.  Nathina testified that: (1) she told her mother and
> Capshaw they were crazy; (2) she left, and afterward, Capshaw tried to contact
> her numerous times by phone; and (3) Nathina did not return his calls.
> However, there is also evidence in the record that Nathina accepted $2500

from Capshaw.

Meanwhile, on October 28, 2009, police, acting on a tip, contacted Nathina and interviewed her about a possible murder-for-hire plot. Nathina agreed to cooperate with their investigation. The next morning, while investigators conducted video and audio surveillance, Nathina went to her mother Karen's house to talk about Capshaw's wanting to kill his wife. Karen told Nathina to call Capshaw.

That afternoon, with investigators recording, Nathina called Defendant Capshaw on a cell phone and told him she had "somebody that can do that for you." Capshaw suggested they meet at Lowe's, where Capshaw was working. After the call ended, Nathina's boyfriend, Tate O'Neal, volunteered to pose as the "hitman" and go with Nathina to Lowe's.

Nathina and O'Neal were wired with video and audio recording devices and, while under police surveillance, went to Lowe's and met with Defendant Capshaw. O'Neal and Capshaw discussed Sandra's apartment and possible payment. Capshaw agreed to call O'Neal after he got off work to arrange a second meeting to show O'Neal the area around Sandra's apartment.

Later that evening, Defendant Capshaw called O'Neal at the cell phone number Nathina had used to call Capshaw earlier. Capshaw told O'Neal he was ready to meet. O'Neal stalled Capshaw until he could report to investigators, at which point O'Neal returned Capshaw's call in the presence of law enforcement and while the call was recorded. Capshaw and O'Neal arranged to meet at Nurse-Temps, another place where Capshaw worked.

O'Neal and his car were equipped with video and audio recorders. Then, O'Neal drove to Nurse-Temps and picked up Capshaw. Following Capshaw's directions, O'Neal drove to Sandra's apartment complex. Capshaw pointed out Sandra's apartment, a secluded place for O'Neal to park his car, routes for an easy getaway and a nearby motel where O'Neal could go to clean up after the murder. Capshaw gave O'Neal Sandra's work schedule and said he did not care how O'Neal killed Sandra as long as she was dead. When O'Neal suggested using a gun with a silencer, Capshaw suggested using a knife or machete, which would be quieter. When they drove back to Capshaw's car, Capshaw gave O'Neal a knife and a box of latex gloves.

Defendant Capshaw testified in his own defense and denied that he was

involved in a plot to kill his wife.  According to Capshaw, Nathina threatened to harm Capshaw and his son unless Capshaw paid her for killing Sandra. Capshaw admitted giving Nathina money on multiple occasions to ensure that nothing happened and claimed his meetings with Nathina and O'Neal were to gather enough information to go to the police.  Capshaw contended he gave O'Neal the knife and gloves "to get something in [O'Neal's] vehicle" so the police would know Capshaw was telling the truth.  Defendant Capshaw claimed he was on his way to the police to report the plot when he was arrested.

*United States v. Capshaw*, 440 F. App'x 738, 740-41 (11th Cir. 2011).

## III.   DISCUSSION

*A.    Substantive Claims in § 2255 Motion*

Capshaw's § 2255 motion includes substantive claims that his arrest on a criminal complaint deprived him of his Fifth Amendment right to due process (Doc. No. 1 at 6-12)[3] and that his conviction was obtained through a search and seizure that violated his Fourth Amendment rights (Doc. No. 1 at 3-6).[4]  These are claims that Capshaw could have raised on direct appeal, but did not.

Ordinarily, if an available claim is not advanced on direct appeal, it is deemed

---

[3] With regard to the alleged due process violations, Capshaw maintains that (a) following his arrest on a criminal complaint, there was unnecessary delay in his being brought before a magistrate judge (Doc. No. 1 at 7), and (b) the affidavit submitted in support of the criminal complaint contained a false statement regarding the settled-upon price for the murder-for-hire (Doc. No. 1 at 7-10).

[4] With regard to the alleged Fourth Amendment violations, Capshaw maintains that (a) City of Dothan police officers conducted an unlawful inventory search of his vehicle (Doc. No. 1 at 3); (b) his and other individuals' cell phone records were unlawfully searched without a warrant (Doc. No. 1 at 4); (c) the affidavit submitted in support of the warrant to search his residence contained a false statement regarding the settled-upon price for the murder-for-hire (Doc. No. 1 at 4-5); (d) the search warrant for his residence listed an incorrect address (Doc. No. 1 at 6); and (e) the contents of his wallet were unlawfully searched without a warrant following his arrest (Doc. No. 1 at 6).

procedurally barred in a § 2255 proceeding.  *See Mills v. United States*, 36 F.3d 1052, 1055-56 (11th Cir. 1994); *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir. 1989). A petitioner can avoid this procedural bar only by showing both cause for the failure to raise the claim on direct appeal and actual prejudice arising from that failure.[5]  *See United States v. Frady*, 456 U.S. 152, 167-68 (1982); *Mills*, 36 F.3d at 1055.

Capshaw suggests that the ineffective assistance of his appellate counsel is the cause for his failure to raise these claims on direct appeal.  *See* Doc. No. 1 at 6 & 12.  What is more, he presents independent claims of ineffective assistance of trial counsel predicated on these same allegations regarding his arrest on a criminal complaint and the allegedly unlawful searches and seizures.  *See* Doc No. 1 at 13-14.  This court will therefore address the underlying substantive claims in the context of Capshaw's related claims of ineffective assistance of counsel.  These and all of Capshaw's ineffective-assistance claims are reviewed below in this Recommendation (*see* Part III.B).[6]

## B.   *Ineffective Assistance of Counsel*

A claim of ineffective assistance of counsel must be evaluated against the two-part

---

[5] "Alternatively, under the fundamental miscarriage of justice exception, 'in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of cause for the procedural default.'"  *Mills*, 36 F.3d at 1055-56 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

[6] Kevin L. Butler, an attorney with the Federal Defender's Office, represented Capshaw throughout pretrial proceedings, at trial and sentencing, and on appeal.  Butler was assisted in Capshaw's defense by other attorneys with the Federal Defender's Office, in particular Attorney Aylia McKee.

test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 689. Second, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000).

Scrutiny of counsel's performance is "highly deferential," and the court indulges a "strong presumption" that counsel's performance was reasonable. *Chandler*, 218 F.3d at 1314 (internal quotation marks omitted). The court will "avoid second-guessing counsel's performance: It does not follow that any counsel who takes an approach [the court] would not have chosen is guilty of rendering ineffective assistance." *Id.* (internal quotation marks and brackets omitted). Thus, "[g]iven the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." *Id.*

As noted, under the prejudice component of *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" *Strickland*, 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The prejudice prong does not focus only on the outcome; rather, to establish prejudice, the petitioner must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable. *See Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)

9

("[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id*. at 372.

Unless a petitioner satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied. *Strickland*, 466 U.S. at 687. Accordingly, once a court decides that one of the requisite showings has not been made, it need not decide whether the other one has been. *Id*. at 697; *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998).

A criminal defendant's right to effective assistance of counsel continues through direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Ineffective assistance of appellate counsel may be shown if the movant can "establish . . . that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker. . . . Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

The Supreme Court has held a criminal defendant's appellate counsel is not required to raise all nonfrivolous issues on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). In so holding, the Court noted, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on

one central issue if possible, or at most on a few key issues." *Id*. at 751-52. Therefore, it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues. *Smith v. Robbins*, 528 U.S. 259, 287-88 (2000).

### 1.      Arrest on Criminal Complaint

Capshaw contends that his trial and appellate counsel rendered ineffective assistance by failing to challenge his arrest on a criminal complaint based on unnecessary delay in his being brought before a magistrate judge. Doc. No. 1 at 12-13; *see also* Doc. No. 1 at 7. He also argues that trial and appellate counsel were ineffective for failing to challenge the validity of the affidavit submitted in support of the criminal complaint on the ground that it contained a false statement regarding the settled-upon price for the murder-for-hire. *Id*. at 13; *see also id.* at 7-10.

Unnecessary delay

Capshaw asserts that there was unnecessary delay between his arrest on the criminal complaint and his presentment before a magistrate judge, which he says violated the Federal Rules of Criminal Procedure and deprived him of his right to due process. Doc. No. 1 at 12-13; *see also* Doc. No. 1 at 7. He maintains that his trial and appellate counsel were ineffective for failing to raise this claim. *Id*.

 Federal Rule of Criminal Procedure 5 requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a

11

magistrate judge, or before a state or local judicial officer as Rule 5(c) provides[.]" Fed. R. Crim. P. 5(a)(1)(A).  Rule 5(c) provides that "[i]f the defendant is arrested in the district where the offense was allegedly committed[,] . . . the initial appearance must be in that district; and . . . if a magistrate judge is not reasonably available, the initial appearance may be before a state or local judicial officer."  Fed. R. Crim. P. 5(c)(1)(A) - (B).  The purpose of Rule 5 "is to have a judicial officer advise the defendant of his constitutional rights and thereby to prevent administrative dete[n]tion without probable cause and to reduce the opportunity for third-degree practices."  *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir. 1973).  The only remedy the Eleventh Circuit has recognized for a violation of Rule 5 is the suppression of evidence obtained as a result of the violation.  *See United States v. Carruthers*, 458 F. App'x 811, 818 (11th Cir. 2012) (citing *Mendoza*, 473 F.2d at 702).

The record indicates that on Friday, October 30, 2009, Douglas W. Carr, a special agent with the FBI, submitted an affidavit in support of a federal criminal complaint to U.S. Magistrate Judge Charles S. Coody, presenting facts in support of Capshaw's arrest for plotting to have his estranged wife, Sandra Capshaw ("Sandra"), murdered by another person in return for payment. Ex. A at 1-6.  Judge Coody found that the affidavit presented probable cause for petitioner Capshaw's arrest and authorized his arrest.  *Id*.; *see also* Case No. 1:09cr188-MEF, Doc. No. 3.

Capshaw was arrested in his car in Dothan, Alabama, on the afternoon of October 30, 2009, at around 12:15 p.m.  TTr.-Vol. II at 165, 169.  He was questioned by law enforcement

agents that afternoon, sometime after 2:00 p.m.  *Id*.  After waiving his *Miranda*[7] rights, he denied any involvement in a plan to have his wife killed.  On Monday, November 2, 2009, the first business day after his arrest, Capshaw was transported to the United States District Courthouse in Montgomery, Alabama, where he was brought before a magistrate judge for an initial appearance.  *See* Case No. 1:09cr188-MEF, Doc. Nos. 4 & 5.

Capshaw fails to specify the evidence due to be suppressed because of the alleged violation of Fed. R. Crim. P. 5.[8]  More significantly, he fails to demonstrate that there was an unnecessary delay that violated Rule 5.  Capshaw was arrested on the criminal complaint on a Friday afternoon in Dothan, Alabama, and was brought before a magistrate judge in Montgomery, Alabama, the following Monday, the first business day after his Friday arrest.  Although he appears to suggest that he might have been more quickly brought before a state or local judicial officer, *see* Fed. R. Crim. P. 5(c), Capshaw was arrested in the Middle District of Alabama, and a federal magistrate judge was "reasonably available" for his initial appearance.

Capshaw demonstrates no basis for his trial and appellate counsel to argue that his rights were violated by unnecessary delay between his arrest on the criminal complaint and his presentment before the magistrate judge.  Nor does he demonstrate how he was prejudiced by his counsel's failure to raise this issue.  Consequently, he is not entitled to any

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[8] Even in cases involving an undue delay in presentment, a voluntary confession made within six hours of arrest remains admissible.  18 U.S.C. § 3501(c).

relief based on this claim of ineffective assistance of counsel.

<u>False statement in affidavit</u>

Capshaw next asserts that Special Agent Carr's affidavit submitted in support of the criminal complaint falsely stated that Capshaw and Timothy "Tate" O'Neal had agreed on a price of $3,000 for O'Neal to carry out the murder of Sandra, to be paid once Capshaw received a payout from Sandra's life insurance policy.  Doc. No. 1 at 7-10; *see* Ex A at 5. According to Capshaw, there was no evidence that he and O'Neal agreed on an amount to be paid for the planned murder.  Capshaw maintains that the allegedly false statement by Agent Carr invalidated the criminal complaint and that his trial and appellate counsel were ineffective for failing to raise this claim.  Doc. No. 1 at 7-10, 13.

As with his previous argument, Capshaw fails to specify any evidence that should have been suppressed because the criminal complaint was obtained through an allegedly false statement.  As noted, the only remedy recognized for such an impropriety would be the suppression of evidence obtained as a result of the violation.  *Carruthers*, 458 F. App'x at 818; *Mendoza*, 473 F.2d at 702.  Because Capshaw does not point to specific evidence that should be suppressed, he fails to demonstrate any prejudice resulting from the allegedly false statement.

Furthermore, while Tate O'Neal's testimony at trial indicated that there was not a fixed, agreed-upon price for the murder-for-hire, O'Neal's testimony fully supported Agent Carr's statements in the affidavit that O'Neal and Capshaw had agreed to settle on a specific

14

price for the hit at a later time, that Capshaw intended to raise the money to pay O'Neal, and that Capshaw had already paid Nathina Whitaker (O'Neal's girlfriend) $2,500 to commit the murder and $1,250 to another person, but that the job had not been done.[9]  *See* Ex. A at 5; TTr.-Vol. III at 95, 117-20.  In addition, evidence was presented at trial that Capshaw also told O'Neal he could take a large amount of cash he believed Sandra had in her apartment, as well as items of her jewelry, after committing the crime.

Capshaw fails to establish deliberate falsehood or reckless disregard for the truth in Agent Carr's affidavit.  Further, even if Agent Carr's averment in the affidavit that Capshaw and O'Neal agreed upon a price of $3,000 for the planned murder-for-hire were to be deemed "false," when that statement is stricken from the affidavit, the remaining averments in the affidavit are sufficient to establish probable cause supporting issuance of the criminal complaint – because the remaining statements support a finding that Capshaw paid, or

---

[9] In part of the affidavit, Agent Carr summarized the contents of an audio recording of an October 29, 2009, conversation between Capshaw and O'Neal, in which the details of the planned murder-for-hire were discussed.  O'Neal was wearing a body recording device at the time.  The portion of Agent Carr's affidavit relevant to the instant issue stated:

> O'NEAL asked CAPSHAW, "pretty much, as long as she's dead and gone, me and you can get money situated later?  Except for the few hundred that I need to take off with."  CAPSHAW responded, "yep."  CAPSHAW also described how he did not want to take out any large sums of money from the bank, because it would raise suspicion.  CAPSHAW did agree to attempt to raise as much money as he could, without raising suspicion.  CAPSHAW said that he had already paid someone $2,500 to commit the murder, and another person $1,2500 but the job had not been done yet.  O'NEAL and CAPSHAW settled on a final price of $3,000, which would be paid once CAPSHAW received the insurance payment.

Ex. A at 5.

promised to pay, "anything of pecuniary value" in exchange for commission of the murder, an element of murder-for-hire pursuant to 18 U.S.C. § 1958.  *See United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001) (evidence stemming from search warrant will not be suppressed unless defendant demonstrates that (1) search warrant affidavit contained perjurious statements or statements made with a reckless disregard for the truth and (2)  the search warrant is no longer supported by probable cause after striking the perjurious or reckless statement).

Capshaw does not demonstrate that his trial and appellate counsel performed deficiently by failing to challenge the allegedly false statement by Agent Carr in the affidavit submitted in support of the criminal complaint.  Nor does Capshaw demonstrate resulting prejudice.  Therefore, he is not entitled to any relief based on this claim of ineffective assistance of counsel.

### 2.    Fourth Amendment Violations

Capshaw contends that his conviction was obtained through an illegal search and seizure and that his trial and appellate counsel were ineffective assistance for failing to allege the following Fourth Amendment violations:

- City of Dothan police officers conducted an unlawful inventory search of his vehicle;

- his and other individuals' cell phone records were unlawfully searched without a warrant;

- the affidavit submitted in support of obtaining the warrant to search his residence contained a false statement regarding the

16

settled-upon price for the murder-for-hire;

• the search warrant for his residence listed an incorrect address; and

• the contents of his wallet were unlawfully searched after his arrest.

Doc. No. 1 at 3-6 & 13-14.

<u>Inventory search</u>

After Dothan police arrested Capshaw in his car on October 30, 2009, they conducted an inventory search of his vehicle. The inventory search yielded a machete (found on the back floorboard) and two folding knives. These items were admitted in evidence at trial. *See* TTr.-Vol. IV at 67-73. According to Capshaw, the Dothan police did not follow department procedure in conducting the inventory search. Doc. No. 1 at 3. He maintains that his counsel was therefore ineffective for failing to challenge the legality of the inventory search. *Id*. at 3 & 13-14.

At trial, Christoper Barberree, an investigator with the violent crimes division of the Dothan Police Department, testified as follows regarding the inventory search of Capshaw's vehicle:

Q [Government's attorney]: Okay. At some point after that, did you arrive on the scene?

A [Investigator Barberree]: Yes, sir.

Q: What did you see when you got there?

A: When I arrived, I observed the vehicle belonging to Mr. Capshaw

17

parked, you know, pulled over, and Mr. Capshaw was in custody on the curb.

Q:  What did you do when you got there?

A:  When I arrived–

Q:  I'm sorry. Could you sit back down so I can hear you?

A:  Okay.  Sorry.

When I arrived at the scene, it was just moments later.  They took Mr. Capshaw, left the scene, went to the Dothan Police Department.  I stayed with the vehicle.  I would say approximately 30 minutes time frame when all of this is going on, maybe less.

Q:  What was your duty while you were there, and why did you stay with the vehicle for that time?

A:  I stayed with the vehicle, waiting – I had called for a tow truck to arrive at the scene to tow the vehicle and also to inventory the vehicle.

Q:  What does that mean, inventory the vehicle?

A:  Any time we tow a vehicle, we just do a basic look-through of the vehicle to make sure, if there's anything of significance in the vehicle, notate it on the tow form, things like that.

Q:  Did you do anything else while you were out there regarding the vehicle?

A:  I collected two knives and a machete out of the vehicle.

TTr.-Vol. IV at 67-68.

The Government argues that Capshaw's arrest required that the Dothan police take custody of his car, given Capshaw's unavailability to operate the vehicle himself, and that the inventory search of the vehicle did not violate the Fourth Amendment.  *See* Doc. No. 10

18

at 20.

Inventory searches, conducted pursuant to an established procedure, but without a warrant, on legally impounded vehicles are valid under the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976). "Nothing . . . prohibits the exercise of police discretion [in deciding to impound a vehicle,] so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine*, 479 U.S. 367, 375 (1987). Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, police officers may impound a vehicle, but the decision to impound a vehicle must be made in good faith, based upon standard criteria, and not solely based upon "suspicion of evidence of criminal activity." *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992). If law enforcement officials have the authority to conduct a valid impoundment, they are not constitutionally required to permit an arrestee to make an alternative disposition of his vehicle. *Id*.

Capshaw wholly fails to support his cursory assertion that Dothan police did not follow department procedure in conducting the inventory search of his vehicle. Nor does he remotely demonstrate that Investigator Barberree's actions were in bad faith or failed to comport with the general purpose of inventory searches. As such, Capshaw fails to set forth sufficient allegations to establish that his counsel's failure to raise an objection to the inventory search was unreasonable under prevailing professional norms. Rather, it seems likely that counsel did not raise this argument because he concluded that the impounding was

done in accordance with Dothan Police Department policy.

Because Capshaw has not presented sufficient evidence to establish otherwise, there is no deficiency. And because Capshaw fails to demonstrate that the inventory search violated his constitutional rights, he has not demonstrated that he was prejudiced by his counsel's failure to raise this issue. Therefore, Capshaw is not entitled to any relief based on this claim of ineffective assistance of trial and appellate counsel.

<u>Cell phone records</u>

Capshaw contends that his trial and appellate counsel were ineffective for failing to argue that his and other individuals' cell phone records were unlawfully searched without a warrant. Doc. No. 1 at 4 & 14. He argues that the Government could not legally obtain this information without first obtaining a search warrant based on probable cause. *Id*.

At trial, through the testimony of Jeffrey Strohm, a records custodian for Sprint Nextel Corporation, the Government introduced records, obtained through subpoena, concerning incoming and outgoing calls for Capshaw's cell phone number, as well as those of Karen Whitaker, Nathina Whitaker, and Tate O'Neal, during the months of September through November 2009. TTr.-Vol. II at 4-12. The records reflected basic subscriber information, including the name associated with a particular phone number along with the date range that the phone was active for the subscriber name, and also reflected the date, time, and duration of the phone calls, the number with whom the call occurred, and any cell phone tower used during the phone call. *Id*. The records did not reflect any information related to the content

of the phone calls.

The Government introduced the cell phone records to demonstrate Capshaw's pattern of using his phone, a "facility of interstate commerce," to advance his murder-for-hire plot.[10] Leaving aside the question of whether Capshaw even had standing to challenge any "search" of the cell phone records of Karen Whitaker, Nathina Whitaker, and Tate O'Neal,[11] Capshaw could not have had a reasonable expectation of privacy in any of the information that was obtained from Sprint Nextel, including the information related to his own cell phone records. The Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntary turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). It is unreasonable for Capshaw to have been unaware that the information reflected in the cell phone records admitted at trial was being transmitted to the phone company, and so he "assumed the risk that the company would reveal to police the [information]." *Smith*, 442 U.S. at 744 ("When he used his phone, petitioner voluntary conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business."). *See also United States v. Beckett*, 369 Fed. App'x 52, 55-56 (11th Cir. 2010); *United States v. Jones*, No. 2:12cr30-MEF, 2012 WL 2568200, at *3-4 (M.D. Ala. Jun. 15, 2012); *United States v. Madison*, No. 11-60285-CR

---

[10] *See* testimony of FBI Agent Donald M. Van Hoose, TTr.-Vol. II at 188-89; TTr.-Vol. III at 10-19. The cell phone records were not introduced for the purpose of tracking Capshaw's movements.

[11] A defendant would not have standing to seek to suppress the records of someone else's telephone in which that defendant has no personal interest.

2012 WL 309537, at *6-9 (S.D. Fla. Jul. 30, 2012).

For the foregoing reasons, there was no legitimate basis for Capshaw's trial or appellate counsel to argue that the cell phone records at issue were unlawfully searched without a warrant.  As such, counsel was not ineffective for failing to raise this issue.  *See Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (counsel is not ineffective for failing to argue a meritless claim); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (same).

<u>Affidavit and search warrant</u>

Capshaw maintains that his trial and appellate counsel were ineffective for failing to argue that the warrant to search his residence was invalid because (1) the affidavit submitted in support of obtaining the warrant – like the affidavit submitted in support of the criminal complaint (discussed in Part III.B.1, above) – contained a false statement regarding the settled-upon price for the murder-for-hire; and (2) the warrant listed an incorrect address for his residence.  *See* Doc. No. 1 at 4-6 & 14.

*False statement in affidavit*

On November 9, 2009, Donald M. Van Hoose, a special agent with the FBI, submitted an affidavit in support of obtaining a warrant to search Capshaw's residence.  *See* Case No. 1:09cr188-MEF, Doc. No. 39-1.  The 10-page affidavit contained, among other things, three single-spaced pages of averments by Agent Van Hoose detailing the investigation into

Capshaw's involvement in the suspected murder-for-hire plot.[12]  *Id*. at 4-6.  One of Van

Hoose's statements indicated that Capshaw and Tate O'Neal had agreed on a price of $3,000

for O'Neal to carry out the murder, an amount Capshaw was supposed to pay after receiving

a payout from the intended victim's life insurance policy.  *Id*. at 7.  This statement by Agent

Van Hoose was essentially the same statement set forth by Agent Carr in the affidavit Agent

Carr submitted in support of the criminal complaint against Capshaw (*see* Part III.B.1,

*supra*).  As he does with regard to the criminal-complaint affidavit, Capshaw asserts that this

statement was false and argues that its inclusion in the search-warrant affidavit invalidated

the search warrant, rendering all items seized during the search of his residence "fruit of the

poisonous tree."  Doc. No. 1 at 4-6 & 14.  He then asserts that his trial and appellate counsel

were ineffective for failing to raise this claim.  *Id*.

As with Agent Carr's statement in the criminal-compliant affidavit, Capshaw fails to

establish deliberate falsehood or reckless disregard for the truth in Agent Van Hoose's

statement in the search-warrant affidavit.  Furthermore, as noted earlier, evidence stemming

from a search warrant will not be suppressed unless the defendant demonstrates that (1) the

search-warrant affidavit contained perjurious statements or statements made with a reckless

disregard for the truth *and* (2) the search warrant is no longer supported by probable cause

---

[12] The warrant for the search of the residence was initiated after Sandra, who had previously moved out of the marital home, moved back into the home (following Capshaw's arrest) and alerted investigators to the existence of documents that might be relevant to the case against Capshaw.  Ex. H at 1-2.  While in the residence, Sandra observed copies of legal documents related to divorce proceedings between her and Capshaw.  *Id*.  One of the documents was a life insurance policy on Sandra that named petitioner Capshaw as the beneficiary.  *Id*. at 2.

after striking the perjurious or reckless statement. *United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001). Even if the statement by Agent Van Hoose were to be deemed "false," when the statement is stricken from the search-warrant affidavit, the remaining averments in the affidavit are abundantly sufficient to establish probable cause to support issuance of the search warrant.

The Fourth Amendment requires that, 'no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The law does not require that every conceivable explanation other than a suspect's illegal conduct be ruled out in order to find probable cause, "[i]nstead, we need only consider whether there are facts that, given the factual and practical considerations of everyday life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998) (citations omitted). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F .3d 526, 531 (6th Cir. 2005)).

Even if Capshaw's counsel had objected to the allegedly false statement by Agent Van Hoose in the search-warrant affidavit, the search warrant would not have been invalidated, and the evidence obtained from the search of Capshaw's residence would not have been subject to suppression as fruit of the poisonous tree. Accordingly, Capshaw's trial and

24

appellate counsel did not render ineffective assistance by failing to raise this issue, and Capshaw is not entitled to any relief based on this claim in his § 2255 motion.

*Incorrect address on search warrant*

Capshaw contends that he search warrant listed an incorrect address for his residence and thus was invalid. *See* Doc. No. 1 at 6 & 14. He argues that his trial and appellate counsel should have raised such a claim and were ineffective for failing to do so. *Id*.

The search warrant[13] lists Capshaw's residence at a street address in Dothan, Alabama. Capshaw contends that his residence is actually located at the same street address in *Rehobeth*, Alabama, which he says is approximately four miles from the Dothan city limits.[14] Doc. No. 1 at 6.

The Fourth Amendment requires search warrants to describe the place to be searched with sufficient particularity to enable the executing officers to locate and identify the premises with reasonable effort. *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986). Capshaw does not dispute that the search warrant adequately described the residence, its location relative to other landmarks, and its owner. The only cited deficiency in the description is the location of the residence in Dothan rather than Rehobeth, Alabama,

This court finds that the alleged mistake in the warrant was not such that the executing officers were unable to identify the premises with reasonable effort. *See, e.g.*, *United States*

---

[13] *See* Case No. 1:09cr188-MEF, Gov. Ex. 3C.

[14] Rehobeth is part of the Dothan Metropolitan Statistical Area.

*v. Biles*, 100 F. App'x 484, 491 (6th Cir. 2004) (finding search warrant adequately described residence to be searched although it placed the residence in the wrong city, where warrant adequately described residence, its location to other identifiable landmarks, and its owner). Capshaw demonstrates no reasonable probability that some other premises might have been mistakenly searched.   Also, the affiant officer, Agent Van Hoose, participated in the execution of the search warrant.  *See Lyons v. Robinson*, 783 F.2d 737, 738 (8th Cir. 1985) (stating that where the same officer applies for and executes the warrant a mistaken search is unlikely).

Because the search warrant adequately described the place to be searched, Capshaw's trial and appellate counsel did not render ineffective assistance when they failed to challenge the search warrant on this basis.

<u>Search of contents of wallet</u>

Capshaw says that bank deposit slips that police found in his wallet following his arrest were introduced as evidence against him at trial; he suggests that the search of his wallet required a warrant and that his counsel should have raised this issue on appeal.  *See* Doc No. 1 at 6.

> [O]nce the accused is lawfully arrested and in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*United States v. Edwards*, 415 U.S. 800, 807 (1974).

The search of the of contents of Capshaw's wallet was justified as a search incident to a lawful arrest. *See United States v. Baldwin*, 644 F.2d 381, 384 (5th Cir. 1981); *United States v. Castro*, 596 F.2d 674, 677 (5th Cir. 1979); *United States v. McEachern*, 675 F.2d 618, 621 (4th Cir. 1982); *United States v. Passaro*, 624 F.2d 938, 944 (9th Cir. 1980). Consequently, his appellate counsel was not ineffective for failing to pursue this issue. Counsel is not obligated to argue meritless claims. *Chandler*, 240 F.3d at 917; *Winfield*, 960 F.2d at 974.

### 3.    Impeachment of Witnesses

Capshaw maintains that his trial counsel failed to properly impeach witnesses, "even when he knew that they were committing perjury and that it would affect the outcome of the proceedings." Doc. No. 1 at 13.

Although Capshaw points to no specific instances of inadequate impeachment under the heading for this claim in his § 2255 motion, in his response to the affidavit filed by his trial counsel, he suggests that his counsel was ineffective for (a) failing to impeach Tate O'Neal with evidence of prior arrests; (b) failing to impeach O'Neal's mother, Sandra Phillips, with evidence that she had several different aliases and several different Social Security numbers; and (c) failing to impeach Agent Van Hoose with evidence suggesting he received a telephone call at his FBI office from Nathina Whitaker on a date later than the date he testified he had last spoken to her. Doc. No. 12 at 3-5.

27

<u>Tate O'Neal</u>

The Government's attorney elicited testimony from Tate O'Neal during direct examination revealing that O'Neal had a prior felony conviction on drug charges arising in Dothan, Alabama.  TTr.-Vol. III at 77-78.  When the Government's attorney asked O'Neal if he had "any other run-ins with the law," O'Neal responded, "Other than a few traffic tickets, seat belt tickets or so, other than that, no, sir."  *Id*. at 78.  Capshaw now alludes to "documents provided by the FBI" – which he has not submitted with his pleadings and are not otherwise evident in the records before this court – that he says reflect that O'Neal was arrested several times between 2001 and 2003, in Dothan and Houston County, Alabama, on drug-possession charges.  Doc. No. 12 at 3-4.  Capshaw faults his trial counsel for failing to impeach O'Neal with evidence of the drug-possession arrests.

Because the Government's attorney elicited testimony from O'Neal about his prior felony conviction, it would have been unnecessary and redundant for Capshaw's trial counsel to question O'Neal further about this same conviction for impeachment purposes.  Thus, counsel cannot be faulted for choosing not to do so.

As for O'Neal's prior arrests for drug possession, under Federal Rule of Evidence 609, the mere existence of an arrest is not admissible to impeach a witness's credibility.  *See United States v. Labarbera*, 581 F.2d 107, 108-09 (5th Cir. 1978).  Moreover, evidence of a witness's prior *conviction* is admissible under Rule 609 only if (1) the conviction is for a crime punishable by death or imprisonment in excess of one year or (2) it can readily be

28

determined that establishing the elements of the crime required proof of an act of dishonesty or false statement by the witness.  *See* Fed. R. Evid. 609(a)(1)-(2).  Thus, standing alone, O'Neal's prior arrests on drug-possession charges were not admissible to impeach his credibility.

Even assuming that O'Neal had been previously arrested on drug-possession charges, it is not self-evident that his answer to the prosecutor's question about "other run-ins with the law" was untruthful.  It cannot be ascertained if O'Neal's felony drug conviction arose from one or more of the prior drug arrests.  Moreover, in context, where O'Neal was being questioned about prior convictions, it is not unreasonable that he may have understood the prosecutor to be asking him about other offenses resulting in convictions.  Finally, any impeachment value to be derived from questioning O'Neal about prior arrests would have been negligible compared to the fact of his felony conviction, which was made known to the jury.  Capshaw fails to demonstrate that his trial counsel rendered ineffective assistance in this regard.

<u>Sandra Phillips</u>

Capshaw maintains that the defense was provided with a "rap sheet" for Sandra Phillips (Tate O'Neal's mother), which he says reveals that Phillips had several different aliases and several different Social Security numbers.  Doc. No. 12 at 3.  He then asserts that his attorney should have sought to impeach Phillips with this information.  *Id*.

Capshaw's claim in this regard is peculiar.  Phillips was called to testify by the

defense, and through her testimony, Capshaw's lawyer elicited evidence suggesting that Nathina Whitaker was an unstable individual with a drug problem and a questionable character.  Much of Capshaw's defense was an attempt to deflect blame for any murder-for-hire plot away from himself and to Nathina Whitaker and her mother, Karen Whitaker.  Therefore, Phillips's testimony was generally helpful to Capshaw and was in no way harmful to his defense.  Even assuming, without finding, that the "rap sheet" information alluded to by Capshaw was admissible to impeach Phillips, the defense would have had little reason to want to do so.  Capshaw fails to demonstrate that his trial counsel rendered ineffective assistance in this regard.

### Agent Van Hoose

Capshaw claims that his counsel was ineffective for failing to impeach Agent Van Hoose with evidence suggesting that the agent had received a telephone call at his FBI office from Nathina Whitaker on a date later than the date he testified that he had last spoken to her.  Doc. No. 12 at 4-5.

The "evidence" Capshaw alludes to here is "[a] statement on a Federal Bureau of Investigation letterhead" indicating that on December 1, 2009, Agent Van Hoose received a telephone call from Nathina Whitaker in which Whitaker "provided her new cell phone number."  *Id*. at 5.  This statement on FBI letterhead is not submitted with Capshaw's pleadings or otherwise apparent in the records before this court.  Capshaw asserts that the statement conflicts with Agent Van Hoose's trial testimony that he had not spoken to

Whitaker since October 29, 2009, because at that point she had become a suspect in the investigation.  *See* TTr.-Vol. III at 32.  Capshaw maintains that his counsel should have impeached Van Hoose based on this conflict.

A document indicting that Nathina Whitaker may have called Agent Van Hoose at his FBI office to "provide her new cell phone number" does not constitute proof that Agent Van Hoose spoke to Whitaker on that occasion.  Even if Agent Van Hoose did receive Whitaker's phone call, the document in question – assuming it was admissible –  indicates no more than that Whitaker called Agent Van Hoose and left her new phone number.  Further, there would have been little impeachment value in seeking to impeach Agent Van Hoose on what amounted to a collateral and immaterial matter.  "A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'"  *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) (quoting 1 McCormick on Evidence § 45 (4th ed. 1992)).  Capshaw does not demonstrate how he was prejudiced by his counsel's failure to impeach Van Hoose on this matter.[15]  Consequently, he is not entitled to any relief based on this claim of ineffective assistance of counsel.

### 4.    Authenticity of Recordings

Capshaw next asserts that his trial counsel rendered ineffective assistance by failing

---

[15] It would seem, given the nature of Capshaw's defense, that it would be to Capshaw's advantage to leave unchallenged a statement by an investigator indicating that Nathina Walker was considered a suspect in the crime.

to challenge the authenticity of various audio and video recordings that were admitted in evidence at trial. Doc. No. 1 at 14.

The record reflects that Capshaw's counsel put the prosecution to the task of establishing a proper foundation before the admission of all audio and video recordings. *See, e.g.*, TTr.-Vol. II at 92-97, 115-17, 126-30, 135-39, 151-60. Capshaw fails to point out any instance where an insufficient foundation was laid. Further, he provides only his own speculation about the possibility that the recordings could have been tampered with. Because his allegations in this regard amount to nothing more than unsupported conclusions, he is not entitled to any relief based on his claim that his counsel was ineffective for failing to challenge the authenticity of recordings.

### 5. Presence During Jury Selection

Capshaw says his trial counsel was ineffective for failing to have him present during jury selection. Doc. No. 1 at 15-16.

The record reflects that Capshaw was present during general voir dire when all questions were answered by the prospective jurors in open court. Doc. No. 20-1 at 5-50; *see id*. at 4-5 (court acknowledges Capshaw's presence, and Capshaw asked to stand during introduction of defense counsel). He was thus able to hear all questions and responses during general voir dire.

It appears that Capshaw is complaining that he was not physically present, after voir dire was completed, at the immediate site – i.e., at the judge's bench for the sidebar

32

conference – where the trial court took the parties' peremptory challenges.  However, the record is devoid of evidence that Capshaw was denied the opportunity to confer with his counsel about the exercise of juror challenges (either "for cause" or peremptory) or to discuss with counsel any misgivings he may have had about particular venire members.  Capshaw claims that his trial counsel "wasted" defense challenges on two prospective jurors after they indicated they didn't think they could follow the court's instructions or be impartial.  Doc. No. 22 at 3-4.  In making this claim, he seems to suggest that, with his input, he would have ensured that the trial court excused the two jurors without the need for the "wasting" of defense challenges.[16]  *Id*.  Capshaw shows that he does not understand the difference between challenges for cause and peremptory challenges.  The two prospective jurors in question were excused because the trial court granted defense counsel's challenges for cause as to the two.  *See* Doc. No. 20-1 at 35-37.  This had no effect on the number of peremptory challenges the defense was allowed to exercise.[17]

Capshaw fails to identify any plausible way in which his interests were prejudiced as a result of his not being physically present at the sidebar conference when the parties' peremptory challenges were exercised.  Consequently, he is not entitled to any relief based

---

[16] Capshaw was present in the courtroom when the trial court granted the challenges for cause as to the two jurors.  However, he was not called to the sidebar at the judge's bench when the two jurors were questioned individually.  *See* Doc. No. 20-1 at 31-37.

[17] A challenge for cause as to a prospective juror may be granted for a specified reason, such as admitted bias or prejudice.  If a prospective juror is excused "for cause," the challenge does not count against the number of peremptory challenges allowed each side.  Thus, a party's successful exercise of a challenge for cause cannot "waste" a party's peremptory challenge.

on this claim of ineffective assistance of counsel.

### 6.    Reference to Post-arrest Correspondence

Capshaw contends that his trial counsel was ineffective for failing to object to the Government attorney's reference to post-arrest correspondence between Capshaw and his son, in defiance, Capshaw says, of the district court's ruling on the defense's pretrial motion in limine.  Doc. No. 1 at 16.

Capshaw's counsel filed a pretrial motion in limine, which stated in pertinent part:

[P]ursuant to Fed. R. Evid. 401, 402, and 403, [Capshaw moves] for an order prohibiting the United States from introducing at trial testimony and evidence of Mr. Capshaw's post-arrest correspondence with his son.  Mr. Capshaw is charged with using a telephone to facilitate the murder of his wife.  Pursuant to its discovery obligations, the government has provided the defense with letters Mr. Capshaw wrote his son after his October 30, 2009, arrest on this charge.  In the letters, Mr. Capshaw provides his son with atypical advice and expresses remorse regarding any strain this pending case is causing.  However, Mr. Capshaw makes no inculpatory statements.

   Irrelevant and/or prejudicial evidence is not admissible at trial.  Fed. R. Evid. 401, 402 and  403.  As this correspondence is not relevant to any of the matters charged in this case and introduction of the letters would expose the trier of fact to unnecessary and prejudicial emotional factors, it should be excluded.  Allowing the government to introduce such unnecessary, irrelevant and emotionally difficult evidence would sidetrack the jury and cause them to focus improperly on the family ties and dynamics between Mr. Capshaw and his son.  Therefore, this evidence must be excluded.

   WHEREFORE, Mr. Capshaw asks the Court to preclude the Government from offering any argument, testimony or evidence regarding the post-arrest correspondence between Mr. Capshaw and his son.

Case No. 1:09cr188-MEF, Doc. No. 76.

In ruling on this motion before the trial began, the district court stated that it was

34

granting the motion conditionally and that it would evaluate its ruling as testimony developed during trial.  TTr.-Vol. I at 2.

Capshaw took the stand at trial.  In his testimony, he denied his involvement in a plot to kill his estranged wife, Sandra, and claimed instead that Nathina Whitaker had threatened to harm him or his son unless he paid her to kill Sandra and that Nathina, Karen Whitaker, and Tate O'Neal were the people actually involved in the plot.  *See, e.g.*, TTr.-Vol. V at 5-6.

When cross-examining Capshaw, the Government's attorney asked Capshaw why, if his family members were in danger, he had never attempted to warn them before his arrest, and why, after his arrest, he did not tell them about the alleged plot in letters he wrote to them from jail.  *See, e.g.*, TTr.-Vol. V at 41-42.  At that point, Capshaw's trial counsel stated that he believed the Government's attorney was "treading on some dangerous ground" and objected on grounds of relevancy.  *Id*.  The district court overruled this objection.  *Id*.  When the Government's attorney then attempted to refresh Capshaw's memory about the contents of the letters by having him read them, Capshaw's counsel again objected and asked for a sidebar to explain his grounds.  *Id*. at 42-43.

Capshaw's counsel explained to the court that he was concerned Capshaw's silence about the alleged plot in the letters to his family was being used against him to undermine his exercise of his right to remain silent following his arrest.[18]  *Id*. at 43.  After noting the

---

[18] Generally, it is improper to attempt to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings, because it asks the jury to draw an inference of guilt from the

(continued...)

conditional nature of its grant of the defense's pretrial motion in limine, the court found that the contents of the letters had been made relevant by Capshaw's own testimony on direct examination, "because [the letters] mention things in here which may either expand or contradict things that [Capshaw] has said about the testimony – through the testimony in this case about what happened." *Id*. 45. The court then ruled that the Government's attorney could introduce the letters for this limited purpose, but cautioned him not to frame questions to Capshaw in such a way as to elicit testimony indicating that he had remained silent because his lawyer had told him to after his arrest. *Id*.

When the Government's attorney continued cross-examination of Capshaw by asking him if he had told his family members about the alleged plot in his letters, he was allowed to show the letters to Capshaw to refresh his memory on the subject. *Id*. at 46-47. After reviewing the letters, Capshaw answered, "Based on what I'm seeing, I would say no." *Id*. at 47. On recross, the Government's attorney also asked Capshaw about his statement in one of the letters, to his son, where Capshaw had claimed, contrary to his trial testimony, that he would not have given money to Karen Whitaker or her family. *Id*. at 60.

Here, Capshaw's own testimony denying participation in the murder-for-hire plot and deflecting the blame to Nathina Whitaker and others rendered the contents of the letters relevant. The court's grant of the pretrial motion in limine was conditional; thus, the

---

[18](...continued)
defendant's exercise of his constitutional right to remain silent. *See Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976).

Government attorney's reference to the letters was not, as Capshaw claims, "in defiance" of the court's ruling.  Capshaw's trial counsel objected as soon as practicable after the prosecutor's first reference to the letters.  In arguing grounds for his objection, Capshaw's counsel was successful in ensuring that the prosecutor did not open the door to testimony from Capshaw that would impugn his exercise of his right to remain silent after arrest.  The only specific evidence adduced about the contents of the letters was relevant to show how certain things Capshaw had said in the letters contradicted his trial testimony.  Finally, none of the allegedly inflammatory "atypical advice" to his son contained in the letters – which is what the defense sought to keep out through its motion in limine – was introduced at trial.

For the foregoing reasons, Capshaw has demonstrated neither deficient performance by his counsel nor resulting prejudice.  Therefore, he is not entitled to any relief based on this claim.

### 7.    Admission of Camouflage Cap

Capshaw next asserts that his trial counsel was ineffective for failing to challenge the admission of a camouflage cap at trial.  Doc. No. 1 at 16-17.  The camouflage cap was admitted in evidence as Government's Exhibit 30.  *See* TTr.-Vol. IV at 71.

At trial, Agent Van Hoose testified that Capshaw's estranged wife, Sandra, turned the camouflage cap over to him at his FBI office on November 13, 2009 – approximately two weeks after Capshaw's arrest and three days after the search warrant for Capshaw's residence was executed.  TTr.-Vol. II at 179-80.  Van Hoose stated that he had specifically looked for

the cap during the search of Capshaw's residence, but had been unable to find it.  *Id.*  at 180.

He stated that the cap appeared to be the same one Capshaw was wearing in a videotaped

meeting that took place between Capshaw and Tate O'Neal on October 29, 2009.  *Id.*  Tate

O'Neal also testified that Government's Exhibit 30 appeared to be the same camouflage cap

Capshaw was wearing during their meeting on October 29, 2009.  TTr.-Vol. III at 92-93, 98.

In his testimony, Investigator Christopher Barberree of the Dothan police identified

photographs that he took of the interior of Capshaw's car following Capshaw's arrest on

October 30, 2009.  TTr.-Vol. IV at 68-71.  Barbarree identified a camouflage hat seen on the

floorboard of Capshaw's car in one of the photographs as looking like the same camouflage

cap admitted in evidence as Government's Exhibit 30.  *Id.*  at 70-71.

When the Government's attorney asked Capshaw during cross-examination if

Government's Exhibit 30 was his camouflage cap, Capshaw stated, "It appears to be."  TTr.-

Vol. V at 34-35.

In his § 2255 motion, Capshaw questions how the camouflage cap seen in his car just

after his arrest on October 30, 2009, later came into Sandra's possession so that she could

then turn the cap over to Agent Van Hoose on November 13, 2009.  Doc. No. 1 at 17.  He

then asks, "Does this constitute tampering with evidence?"  *Id.*

While the record is silent as to how Sandra did come into possession of the

camouflage cap, approximately two weeks passed between Capshaw's arrest – and the

impoundment of his vehicle – and the date on which Sandra turned the cap over to Agent

Van Hoose.  It is unclear if Sandra had access to the car during this time, if the car was turned over to her by police, or if items found in the car were turned over to her.  In any event, Capshaw himself testified that Government's Exhibit 30 appeared to be his camouflage cap, and it is undisputed that a cap appearing to be the same cap was photographed on the floorboard of Capshaw's car after his October 30, 2009, arrest.  Although the record regarding the subsequent custody of that cap is ambiguous, it falls far short of suggesting any "tampering with evidence."  Even if the defense had successfully challenged the chain of custody as to Government's Exhibit 30, the photograph of the cap on the floorboard of Capshaw's car would have been sufficient to allow witnesses, e.g., Agent Van Hoose and Tate O'Neal, to identify the cap in the photograph as looking like the one Capshaw was wearing during his October 29, 2009, meeting with Tate O'Neal.

Capshaw has demonstrated neither deficient performance in this regard by his counsel nor any resulting prejudice.  Therefore, he is not entitled to relief based on this claim of ineffective assistance of counsel.

### 8.    Reasonableness of Sentence

Capshaw next contends that this trial counsel was ineffective for failing to challenge the reasonableness of his sentence, particularly because the victim, Sandra, "suffered no financial loss" as a result of his crime.  Doc. No. 1 at 17-18.

A federal defendant's sentence is subject to review for both procedural and substantive reasonableness.  *Gall v. United States*, 552 U.S. 38 (2007).  Factors a reviewing

court will consider in determining procedural reasonableness include whether the district court properly calculated the guidelines range; improperly treated the guidelines as mandatory; failed to consider the factors set forth in 18 U.S.C. § 3553(a);[19] selected a sentence based on "clearly erroneous facts"; or failed to adequately explain its chosen

---

[19] Section 3553(a) provides the following factors for the court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]

(5) any pertinent policy statement[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

sentence.  552 U.S. at 50-53.  A sentence is substantively reasonable if, under the totality of

the circumstances, it achieves the purposes of § 3553(a).  *United States v. Pugh*, 515 F.3d

1179, 1191 (11th Cir. 2008).

In an affidavit filed with this court,[20] Capshaw's trial counsel addresses Capshaw's

claim that he was ineffective for failing to challenge the reasonableness of his sentence as

follows:

> Mr. Capshaw correctly asserts that undersigned counsel did not seek a lower
> sentence because there was no financial loss to the a victim.  At sentencing,
> financial loss did not control the guideline calculations in this case.
> Additionally, because the alleged (and failed) murder of his ex-wife was at
> issue, I strongly believed that I would draw the strong ire of the court if
> focused on the fact that his ex-wife suffered no financial loss as a result of the
> alleged murder-for-hire plot and therefore his sentence should be reduced.
> Therefore, I made the strategic decision not to focus on that fact when seeking
> a reduced sentence.  At issue was whether the applicable sentencing guideline
> should have been level 32 (base offense level for use of interstate commerce
> for murder for hire) or 37 (Solicitation to Commit Murder where there is an
> offer of money).  Over my objection, the Court applied level 37 and a 2 point
> enhancement for obstruction and determined the applicable guideline range
> was 262 to 327 months imprisonment.  The range then became the statutory
> maximum of 120 months.  Though not on the grounds suggested by Mr.
> Capshaw, I then unsuccessfully argued for a reasonable sentence below the
> statutory maximum.

Doc. No. 7 at 4.

A review of the transcript of the sentencing hearing fully supports the averments by

Capshaw's trial counsel.  *See* Ex. U at 11-14.  Trial counsel presented arguments challenging

the  base  offense  level  applied  to  Capshaw's  crime  and  the  obstruction-of-justice

---

[20] All references to the affidavit filed by Capshaw's counsel are to the affidavit filed by
Attorney Kevin L. Butler (Doc. No. 7).

enhancement and, among other things, also urged the district court to consider Capshaw's character and background in imposing a sentence below the 120-month statutory maximum (which was far below the otherwise applicable advisory guidelines range in Capshaw's case). There is no evidence that the district court improperly calculated the guidelines range, improperly treated the guidelines as mandatory, failed to consider the factors set forth in § 3553(a), selected a sentence based on "clearly erroneous facts," or failed to adequately explain its sentence. *See Gall*, 552 U.S. at 50-53. Further, Capshaw fails to demonstrate that his sentence is substantively unreasonable.[21]  Consequently, he cannot show that his trial counsel rendered ineffective assistance of his trial counsel, and he is not entitled to any relief based on this claim.

### 9.    Failure to Obtain Plea Agreement

Capshaw asserts that his trial counsel was ineffective for failing to obtain a plea agreement in his case.  Doc. No. 1 at 17-18.

In his affidavit filed with the court, Capshaw's trial counsel addresses this claim as follows:

> There were plea discussions in this case.  The substance and details of those discussions were communicated to Mr. Capshaw. Pursuant to those discussions, the government was willing to recommend Mr. Capshaw receive the full three levels for acceptance of responsibility.  However, as discussed *supra* [in counsel's discussion of Capshaw's "reasonableness" claim], this was

---

[21]Although the arguments by Capshaw's counsel on appeal regarding the obstruction-of-justice enhancement went to the procedural reasonableness of Capshaw's sentence, Capshaw has presented no evidence demonstrating that his sentence was substantively unreasonable.  Thus, counsel was not ineffective for raising this issue on appeal.

a unique case in which the applicable guidelines (even with acceptance) were above the statutory [maximum] of 120 months (i.e., level 37- 3 for acceptance, Criminal History Category of I = 151-188 months). Mr. Capshaw was not willing to accept this offer and he maintained his innocence from the offense charged.

Doc. No. 7 at 4-5.

Recently, in *Missouri v. Frye*, ___ U.S. ___, 132 S. Ct. 1399 (2012), and *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376 (2012), the Supreme Court clarified that the Sixth Amendment right to the effective assistance of counsel extends specifically "to the negotiation and consideration of plea offers that lapse or are rejected." *In re Perez*, 682 F.3d 930, 932 (11th Cir. 2012). The Supreme Court concluded that, in order to establish prejudice, a defendant must show a reasonable probability that but for counsel's ineffectiveness: (1) "the plea offer would been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)"; (2) "the court would have accepted its terms"; and (3) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 132 S. Ct. at 1385; *see Frye*, 132 S. Ct. at 1409.

In a response to his trial counsel's affidavit, Capshaw claims (contrary to his counsel's affidavit) that his counsel did not communicate the substance of any plea discussions to him. Doc. No. 12 at 6-7. Capshaw does not, however, claim that he would have been willing to plead guilty to any plea offer the Government was willing to recommend. The averments by

43

Capshaw's counsel in his affidavit do not even establish that any firm plea offer was ever made by the Government, and Capshaw can point to no evidence that the Government in fact made a firm plea offer.  What counsel's affidavit does indicate is that the Government was willing to recommend that Capshaw receive a three-level reduction in his offense level for acceptance of responsibility if he opted to plead guilty.  However, as counsel noted, this reduction for acceptance of responsibility would have reduced Capshaw's offense level from 37 to 34, leaving his advisory guidelines range at 151 to 188 months' imprisonment, still above the 120-month statutory maximum for his offense.[22]  Thus, the record reflects that the Government was never willing to make any plea offer that afforded Capshaw a sentence of less than the 120-month statutory maximum, that is, the sentence actually imposed.  Indeed, at sentencing, the Government's attorney told the court that he regretted he could not find a way to charge Capshaw in such a way that his statutory maximum would be higher than 120 months.  *See* Ex. U at 14.

Applying the relevant factors for consideration as counseled by the Supreme Court in *Frye* and *Lafler*, this court finds that Capshaw has not show a reasonable probability that a plea offer would been presented to the court in his case – i.e., that he would have accepted any plea offer the Government actually made – or that his conviction or sentence under the terms of any such offer would have been less severe than under the judgment and sentence

---

[22] In doing the math here, the court excludes the two-level sentence enhancement imposed on Capshaw based on his obstruction of justice.  *See* U.S.S.G. § 3C1.1.  Presumably, if Capshaw had pled guilty, he would have avoided this enhancement by not committing perjury in his trial testimony.

that in fact were imposed. *Lafler*, 132 S. Ct. at 1385; *see Frye*, 132 S. Ct. at 1409. The court finds wholly implausible the notion that Capshaw would have been willing to plead guilty to the offense as charged and receive the statutory maximum 120-month sentence – and, as noted, there is no evidence that recommending a lower sentence was ever contemplated by the Government. Capshaw does not indicate the terms under which he would have been willing to plead guilty, much less establish that the Government was willing to offer a deal for a day less than the 120-month statutory maximum. Finally, any suggestion by Capshaw that he would have pled guilty under such terms is undermined by his claims of innocence. While Capshaw's denial of guilt is not dispositive, it is nonetheless a relevant consideration. *See, e.g., Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005) (noting that the defendant's assertion of innocence during and after trial undermined his contention that he would have accepted a plea deal); *Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) (same); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) (same); *United States v. Stevens*, 149 F.3d 747, 748 (8th Cir. 1998) (same).

Under the circumstances, Capshaw fails to demonstrate that he was prejudiced by the alleged deficiencies in his counsel's performance in this regard. Therefore, he is entitled to no relief based on this claim.

### 10.     Alleged *Brady* and *Giglio* Violations

Capshaw contends that his trial counsel was ineffective for failing to object to *Brady* and *Giglio* violations by the Government. Doc. No. 1 at 19.

45

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the Government is required to disclose to the defense any material exculpatory evidence in the Government's possession.  A new trial is warranted when there is a reasonable probability that disclosure of undisclosed evidence would have altered the outcome of the case.  *United States v. Bagley*, 473 U.S. 667 (1985).  The Supreme Court extended the *Brady* rule in *Giglio v. United States*, 405 U.S. 150 (1972), which requires the Government to disclose impeachment materials, such as evidence that a witness has been offered leniency from prosecution in exchange for his testimony against a defendant.  Under *Giglio*, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility" justifies a new trial.  *Id*. at 153-54.  The evidence must be material and "[a] new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  *Id*. at 154.

*Brady* (exculpatory) information relates to "evidence which directly tends to lessen a defendant's guilt, e.g., a statement from another person which tends to relieve the defendant of responsibility for the crime."  *United States v. Hopkins*, No. S-05-0538 EJG, 2008 WL 4453583, at *2 (E.D. Cal. Oct. 3, 2008) (unpublished).  *Giglio* (impeaching) information relates to "*witness credibility* type evidence of a *collateral* nature, e.g., evidence that the government's witness who is implicating the defendant is not to be trusted in his implications because of bias, previous misrepresentations in similar matters, and so forth, i.e., indirectly making it less likely that the defendant is guilty."  *Id*. (emphasis in original).

Addressing Capshaw's claim that he was ineffective in this regard, trial counsel states:

> Based upon the discovery provided, my case investigation and the investigation and testimony provided during trial and all other proceedings, to the best of my knowledge, I believe the government provided me with all *Giglio*, *Brady*, and discoverable information.

Doc. No. 7 at 5.

Capshaw's claims of *Brady*/*Giglio* violations by the Government amount to wholly speculative assertions. For example, he speculates that Tate O'Neal, Nathina Walker's boyfriend, "may" have been paid to cooperate in the investigation of the murder-for-hire plot, because FBI Agent Van Hoose, when explaining the early stages of the investigation, testified that an "agent working for us, a potential hit man working for us" was going to be introduced to Capshaw and that it was decided that O'Neal would pose as the "hit man." *See* TTr.-Vol. II at 121. Capshaw maintains that "if" O'Neal was paid "for working for the FBI, [t]his could be construed as *Brady* and or *Giglio* material." Doc. No. 13 at 10-11. Capshaw reads too much into Van Hoose's use of the word "agent" in his testimony.[23] There

---

[23] Elsewhere, Agent Van Hoose testified regarding the use of O'Neal as the "hit man":

> Q [Government's attorney]: Why did you elect to use Mr. O'Neal as the hit man?
>
> A [Agent Van Hoose]: For a number of different reasons. One being that it was developing very quickly, and it's – hit men are not standing around the police department, so it's difficult to find one. At that time, an FBI investigation hadn't been initiated. It was a preliminary investigation, and I was not prepared to commit resources to the case at that point.
>
> Q: Let me stop you right there and explain that. You said an FBI investigation had not been initiated?

(continued...)

_____

[23](...continued)

A:  At that point, I would call it a preliminary investigation.  It was not a full investigation.

Q:  Why was it only a preliminary investigation?

A:  Because at that point, I had still not confirmed Nathina Whitaker's version, nor had it been refuted.  So at that point, I was still unsure of her allegations. . . .

Q:  Now, would it have been difficult for you to find somebody at the FBI or Dothan Police Department or somewhere else who was a law enforcement officer to play the hit man?

A:  Yes, sir.

Q:  How did it first come about that Mr. O'Neal was tapped to play this role?  Did you approach him?

A:  He had volunteered his services, and we began to consider that option.

Q:  And what were the pros and cons that you considered in weighing that option?

A:  One of the unknowns – in trying to make our decision, one of the unknown elements that we weren't sure about is the potential of Mr. Capshaw's suspicions; how caution – how much caution he would exercise in meeting somebody new.  We weren't sure, if we brought in somebody, a complete stranger, maybe he would be too suspicious.  So we considered using somebody that's been around Nathina before, that she's rode in his vehicle many times, and he was a common face around Nathina Whitaker.  And that was probably the biggest pro.  Also, it was rapidly developing, and to find an undercover officer that could fit that role, Dothan Police Department didn't – did not have someone that could fit that role.

Q:  Now, you said – that sounds like pros.  What about cons?

A:  The con is that – the down side to that is he's an informant at that time as opposed to being a law enforcement officer. It's much more convenient for law enforcement to use other law enforcement officers rather than informants, and that was the down side.

(continued...)

48

is absolutely no evidence that O'Neal was a paid by the FBI or any other law enforcement agency. Because Capshaw's claim in this regard is mere unsupported speculation, he cannot show that his trial counsel was ineffective for failing to raise a *Brady*/*Giglio* claim with respect to O'Neal.

Capshaw also asserts that witness "Randy Hutton's 'rap sheet' shows that he pled guilty to receiving stolen property 1st but there is nothing to reveal what kind of sentence he received for this felony. This would violate *Brady* and/or *Giglio* as well." Doc. No. 13 at 11. There is nothing in the record regarding the nature of Hutton's alleged conviction. Moreover, Hutton was called to testify *by the defense*. This court is aware of no authority that would obligate the Government to supply *Giglio* material to the defense when the defense contemplates calling the witness. Thus, Capshaw fails to demonstrate any *Giglio* violation. In any event, no beneficial purpose to Capshaw's defense would have been served by impeaching Hutton with evidence of a prior conviction. On direct examination of Hutton, Capshaw's counsel elicited testimony from him about an incident when he overheard Nathina Whitaker talking on the phone to someone about having a gun and about an apparent plot to kill someone.[24] TTr.-Vol. IV at 138-41. Hutton also opined that "Nathina's only motivation is money." *Id.* at 142. The overall effect of Hutton's testimony was to cast doubt on Nathina

---

[23](...continued)
TTr.-Vol. II at 122-24.

[24] It was Hutton, Nathina Whitaker's former employer, who notified the police based on overhearing Nathina Whitaker's suspicious phone conversation, which then led to the investigation of the murder-for-hire plot.

Whitaker's credibility – and even her innocence –  and thus it was helpful to Capshaw's defense.  Accordingly, it was not ineffective assistance of counsel for Capshaw's lawyer to eschew any attempt to impeach Hutton or to allege a *Giglio* violation.

Capshaw also asserts that the Government committed a *Giglio* violation by offering leniency to Nathina Whitaker without disclosing this information to the defense.  Capshaw hangs this claim on the slender reed of a remark made by an attorney appointed to represent Whitaker as a witness in the case that the prosecutor "had made an offer on [Whitaker] which I need to communicate to her."[25]  TTr.-Vol. III at 5.  However, there is no evidence that an agreement for leniency was reached with Whitaker before she testified.  And when she did in fact testify, the subject was delved into, and the evidence indicated that there was no leniency or immunity agreement in exchange for her testimony. "  TTr.-Vol. IV at 101-02.  Capshaw had presented nothing more to show that any such agreement was reached.  Moreover, the record reflects that Whitaker was called to testify by the defense, obviating the Government's obligations under *Giglio*.   Finally, Capshaw's counsel effectively impeached Whitaker during direct and redirect examination with questions portraying her as a dishonest and violent drug abuser who extorted money from Capshaw with threats against him and his family.  Indeed, this appears to have been the purpose of calling Whitaker to testify, and it was consistent with the defense strategy – most evident in defense counsel's closing argument – of deflecting blame for any murder-for-hire plot away from Capshaw and

---

[25] Part of the appointed counsel's responsibilities was to advise Whitaker about invoking her Fifth Amendment privileges if she testified.

to Nathina and Karen Whitaker.  Impeachment evidence is not material if it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.  *See United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987).  Ample evidence was adduced by Capshaw's counsel to show Nathina Whitaker's propensity and motive to lie about her involvement.

Because Capshaw has demonstrated no *Giglio* violation by the Government with respect to Nathina Whitaker, and because in any event his counsel effectively impeached Whitaker, he is not entitled to relief based on this claim of ineffective assistance of counsel.

### 11.    Chain of Custody of Evidence Seized from Vehicle

Capshaw cursorily asserts that his trial counsel was ineffective for failing to challenge the  chain of custody of the items seized from his car in the inventory search that followed his arrest.  Doc. No. 1 at 20.

Investigator Christopher Barberree with the Dothan Police Department testified that he performed the post-arrest inventory search of Capshaw's car, resulting in his discovery and seizure of a machete and two folding knives.  *See* TTr.-Vol. IV at 67-74.  Investigator Barbaree also took photographs of these items where he found them in Capshaw's vehicle. The photographs and the items themselves were admitted in evidence at trial, after Barberree verified that the photographs were the ones he had taken and that the items appeared to be in substantially the same condition as they were when he found them in Capshaw's vehicle. *Id*.

Capshaw points to no break in the chain of custody, but is content merely to suggest

that it was "apparently broken." Doc. No. 1 at 20. Even today, Capshaw makes no assertion

that the machete and knives admitted into evidence were tampered with or otherwise tainted

in a way harmful to the defense. In his own testimony at trial Capshaw acknowledged that

the machete and knives were in his car when he was arrested and maintained they were put

there by his son. *See* TTr.-Vol. V at 17-18.

Trial counsel's failure to challenge the chain of custody of the machete and knives

was not unreasonable or ineffective assistance of counsel. Therefore, this claim is due to be

denied.

### 12.    Lack of Preparation and Flawed Trial Strategy

Capshaw next claims that his trial counsel

> want[ed] to change the defense, in the middle of the trial, from entrapment to
> a co-conspiracy theory, without my knowledge or consent. This would also
> appear to cause prejudice against me concerning my innocence. This, as well
> as many other issues shows that they were ill-prepared to take this case to trial.
> This definitely constitutes ineffective assistance of counsel.

Doc. No. 1 at 20.

The affidavit submitted by Capshaw's trial counsel contains the following statements

relevant to this claim:

> During the course of my representation, the Federal Public Defender
> Office for the Middle District of Alabama, my case team (i.e. co-counsel, two
> investigators and a legal assistant), and I invested hundreds of hours in case
> preparation. This case preparation included, but was not limited to, thoroughly
> investigating this case, interviewing witnesses, analyzing all facts, consulting
> with Mr. Capshaw, conducting at least a dozen team meetings, conducting

52

multiple "brainstorming sessions," attempting plea negotiations, and reviewing the applicable criminal law and procedure.  Based on my extensive case preparation, my review of the applicable law and procedure, I made the tactical and reasoned determination of: (1) what defense strategy to pursue; (2) what evidence and procedure should be presented and/or challenged orally or in writing; and (3) what arguments should be made.  These determinations were based upon my experience conducting federal criminal trials and my determination of the most effective defense/strategy.  I then zealously represented Mr. Capshaw, zealously presented what I believed to be the proper pretrial, trial and appellate arguments, zealously presented a defense and zealously sought the best sentence possible.  I determined that the pretrial pleadings Mr. Capshaw believes should have been filed were not viable because they were not supported by the law and/or the facts and circumstances of this case.  As I am not required to raise frivolous and/or non-viable arguments, these claims and arguments were not raised. Furthermore, to the extent any of the evidentiary or procedural challenges could have arguably been made, I made the strategic and tactical determination not to pursue them.

As I discuss *supra* . . . , my case and trial preparation was extensive.  As a result, it is my belief that as part of my case strategy, when warranted, I properly:  impeached trial witnesses; challenged the authenticity of records; selected adequate jurors; objected to improper government testimony and evidence; argued effectively to the jury; and presented zealous and proper defense.  There was substantial inculpatory evidence presented by the government.  Though I did not secure a not guilty verdict, I respectfully disagree with Mr. Capshaw's assertion that my trial performance was ineffective.

Doc. No. 7 at 2-4.

A review of the record supports counsel's statement that he zealously and properly defended Capshaw throughout the criminal proceedings.  Capshaw's conclusory claim that his counsel was ill-prepared is simply not supported by record.

The record also does not support Capshaw's claim that his counsel "changed the defense" in the middle of the trial.  The "co-conspiracy theory" to which Capshaw alludes

53

amounted to trial counsel's attempt to gain admission of out-of-court statements made by Nathina Whitaker and Karen Whitaker under the coconspirator-statement rule, Fed. R. Evid. 801(d)(2)(E),[26] in an effort to bolster the defense theory that the murder-for-hire plot was the idea of Nathina and Karen, that the two had managed to enmesh Capshaw in their doings, but that Capshaw really had no intention of committing any crime.  TTr.-Vol. III at 141-50.  The theory under which defense counsel argued for admission of the women's out-of-court statements never conceded Capshaw's guilt.  Although the trial court ultimately rejected the defense's argument that the out-of-court statements were admissible under Rule 801(d)(2)(E), the attempt by Capshaw's counsel to gain admission of such evidence, which was inculpatory as to Nathina and Karen, was consistent with the defense strategy throughout trial of attempting to place blame for the murder-for-hire plot on the two women.

Capshaw fails to show that his counsel was "ill-prepared" to present his defense.  He futher fails to show that it was unreasonable or prejudicial to attempt to gain admission of Nathina and Karen Whitaker's out-of-court statements.  Therefore, this claim of ineffective assistance of counsel is due to be denied.

### 13.   Detention Hearing

Capshaw claims that his trial counsel was ineffective for failing to obtain a transcript of his detention hearing, which he says reflects "perjured testimony" by Government

---

[26] Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that an out-of-court statement is not hearsay if it is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  *See* Fed. R. Evid. 801(d)(2)(E).

witnesses that could have been used to impeach those witnesses at trial.  Doc. No. 1 at 20.

Addressing this claim, Capshaw's trial counsel states:

> I did not order the detention hearing transcript.  However, based upon my case review and investigation, I was able to effectively examine witnesses and present my trial strategy without it.  My trial and strategy revolved around Mr. Capshaw's innocence, the efforts of his niece to "frame" him and force him into the criminal offense, and the Court's lack of jurisdiction.  To the best of my recollection, my case strategy was not negatively impacted by the absence of this transcript.  To the extent the actual transcript was needed or necessary, it is my opinion that the ultimate outcome of the trial would not have been altered.

Doc. No. 7 at 7.

This court has reviewed the detention hearing transcript[27] and agrees with counsel that his performance at trial – including any efforts to impeach Government witnesses – could not have been adversely affected by the lack of the hearing transcript.  Trial counsel represented Capshaw at the detention hearing, where he thoroughly cross-examined witnesses.  He was thus aware of witness testimony presented at the hearing and capable of assessing what, if any, hearing testimony might have impeachment value at trial.

Moreover, and significantly, Capshaw fails to demonstrate that any perjured testimony was presented at his detention hearing.  Nor does he point to any testimony, which if used for impeachment purposes, might have affected the outcome of his trial.

Capshaw fails to demonstrate that his trial counsel rendered ineffective assistance in

---

[27] The detention hearing took place before the magistrate judge over the course of four different days – November 5, 9, 10, and 16, 2009.  *See* Case No. 1:09cr188-MEF, Doc. Nos. 165-168.

this regard, and this claim is due to be denied.

### 14.    Abandonment by Counsel after Appeal Process

Capshaw maintains that he was "abandoned" by counsel following the appeal process in his case, which he says made it difficult for him to obtain the materials he needed to prepare his § 2255 motion.  Doc. No. 1 at 18-19.  He also appears to suggest that he was entitled to have the Federal Defender represent him in pursuing his § 2255 motion.  *Id*.

Capshaw's claim amounts to no more than generalized grievances about his efforts to obtain unspecified records and also to have the Federal Defender's Office represent him in collateral proceedings.  There is no evidence in the record – and Capshaw presents none – that he was improperly hindered in preparing his § 2255 motion or that he was abandoned by counsel.  Capshaw alludes to a letter he says was from the district judge supposedly directing the Federal Defender's Office – for whom Capshaw's trial counsel worked – to "file all the pleadings on his behalf."  Doc. No. 1 at 18.  No such letter is in the record. Capshaw's apparent belief that such a directive, if it existed, would require the Federal Defender to draft his § 2255 motion and represent him in proceedings on that motion is mistaken.  Capshaw himself notes that attorneys with the Federal Defender's Office advised him (correctly) that they could not represent him in his § 2255 proceedings because any allegations of ineffective assistance of counsel brought against one of their own attorneys would create a conflict of interest with their office.  *Id*. at 18-19.  If attorney's with the Federal Defender were to represent Capshaw in § 2255 proceedings, they would effectively

be put in a position of both pursuing and defending claims against themselves.  The Federal Defender was not ordered to represent Capshaw in his § 2255 proceedings, and indeed could not have.

Moreover, there is no "constitutional right to counsel when mounting collateral attacks upon . . . convictions." *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *see also United States v. Davis*, 400 F. App'x 538, 540 (11th Cir. 2010) (§ 2255 proceeding); *United States v. Angelone*, 894 F.2d 1129, 1130 (9th Cir. 1990) ("no right to counsel on . . . collateral post-conviction 28 U.S.C. § 2255 petition").

Capshaw's "abandonment" claim is wholly without merit, and therefore it entitles him to no relief.

## C.   Public Trial Claim

On November 12, 2012, Capshaw filed an amendment to his § 2255 motion in which he a raised a claim that his right to a public trial was violated because, he says, the jury selection proceedings in his case were closed to the public.  Doc. No. 18.  Approximately one month later, Capshaw submitted affidavits from five individuals, all family members of his and all stating essentially the same thing: that while jury selection was taking place in Capshaw's case on the morning of April 12, 2010, they were told by federal marshals near the doors of the courtroom that the jury selection was closed to the public and that they would not be allowed to enter the courtroom until jury selection was complete.[28]  *See* Doc.

---

[28] The five affiants were (1) Patricia Pitts, Capshaw's sister who testified in his defense at
(continued...)

No. 22 at 10-15.

In *Presley v. Georgia*, 558 U.S. 209, 213-16 (2010), a case decided about three months before Capshaw's trial, the United States Supreme Court held that a defendant's Sixth Amendment right to a public trial extends to jury voir dire. *See* 558 U.S. at 213-16. *See also Waller v. Georgia*, 467 U.S. 39 (1984) (Sixth Amendment public trial right extends to pretrial suppression hearing); *Press–Enter. Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501 (1984) (voir dire open to public under First Amendment principles).

It is without dispute that no objection to the alleged closure of jury selection to the general pubic was ever lodged until Capshaw filed the amendment to his § 2255 motion. There is no evidence in the record that the district court ordered that jury selection be closed to the public or instructed court security to bar members of the public from the courtroom during jury selection. Nor is there any evidence that the court was aware of any alleged exclusion of the general public from jury selection.[29] Thus, the only evidence regarding the alleged closure of jury selection are the affidavits of Capshaw's family members, submitted almost two and one-half years after Capshaw's trial, in which the affiants maintain that unnamed federal marshals told them that jury selection was closed to the public and

---

[28](...continued)

trial; (2) Paula M. Perry, another of Capshaw's sisters; (3) William J. Capshaw, Capshaw's nephew, who also testified in Capshaw's defense at trial; (4) Norman Capshaw, Capshaw's brother; and (5) William Capshaw, another of Capshaw's brothers.

[29] There is also an absence of evidence that either the Government or Capshaw's counsel sought closure of the courtroom or were aware of any exclusion of members of the general public.

instructed them that they could not enter the courtroom until jury selection was complete. To the extent the affidavits are offered to show the truth of the alleged statements by the unnamed federal marshals that the courtroom was closed to the public during jury selection, such statements amount to hearsay. Even assuming the truth of the affiants' statements that unnamed federal marshals prevented them from entering the courtroom during what was supposedly jury selection in Capshaw's case, the undersigned finds that Capshaw has not demonstrated his right to relief.

In general, the denial of a defendant's right to a public trial is a "structural error" – i.e., a defect "affecting the framework within which the trial proceeds" – requiring reversal irrespective of whether the defendant demonstrates the error prejudiced his substantial rights. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). "It does not necessarily follow, however, that every deprivation in a category considered to be 'structural' constitutes a violation of the Constitution or requires reversal of the conviction, no matter how brief the deprivation or how trivial the proceedings that occurred during the period of deprivation." *Gibbons v. Savage*, 555 F.3d 112, 120 (2d Cir. 2009). That is, "not every improper partial closure implicates [Sixth Amendment] concern[s]." *Brown v. Kuhlmann*, 142 F.3d 529, 536 (2d Cir. 1998); *see also Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001) (explaining that a defendant's right to a public trial "is not trammeled, for example, by a trivial, inadvertent courtroom closure"); *Braun v. Powell*, 227 F.3d 908, 919 (7th Cir. 2000).

Courts have applied the "triviality exception" to the deprivation of the public trial

right, despite that error's "structural" nature, reasoning that it would be "unimaginable" to

assume that "every temporary instance of unjustified exclusion of the public – no matter how

brief or trivial, and no matter how inconsequential the proceedings that occurred during an

unjustified closure – would require that a conviction be overturned." *Gibbons*, 555 F.3d at

120.

> Whether a particular closure abridges a defendant's Sixth Amendment
> rights hinges on its potential to undermine the values advanced by the public
> trial guarantee, which include (1) ensuring a fair trial; (2) reminding the
> government and the judge "of their responsibility to the accused and the
> importance of their functions"; (3) encouraging witnesses to come forward;
> and (4) discouraging perjury. *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir.
> 1996). In *Peterson*, for example, the Second Circuit held a closure that was
> "1) extremely short, 2) followed by a helpful summation, and 3) entirely
> inadvertent" did not, in that instance, violate a defendant's Sixth Amendment
> rights. 85 F.3d at 44. Additionally, "the exclusion of a family member or
> friend may, in rare circumstances . . . , not implicate the Sixth Amendment
> public trial guarantee." *Carson v. Fischer*, 421 F.3d 83, 94 (2d Cir. 2005); *see
> also United States v. Perry*, 479 F.3d 885, 890-91 (D.C. Cir. 2007) (finding a
> district court's exclusion of the defendant's son to be a trivial closure
> insufficient to raise constitutional concerns).

> Courts have continued to conduct triviality analyses in the wake of
> *Presley*'s holding that the Sixth Amendment extends to voir dire proceedings.
> In *Barrows v. United States*, 15 A.3d 673, 680-81 (D.C. 2011), the Court of
> Appeals for the District of Columbia affirmed a conviction after concluding
> a "brief closure of the courtroom during voir dire" had not "seriously
> compromised the fairness or integrity of [the defendant's] trial." And in *Kelly
> v. State*, 195 Md. App. 403, 6 A.3d 396 (2010), the Maryland Court of Special
> Appeals considered the following factors determinative in holding a closure
> to have been *de minimus*:

>> (1) the limited duration of the closure, two to three hours during
>> voir dire;

>> (2) that the closure did not encompass the entire proceedings of

voir dire and jury selection, and that a significant portion of the
proceedings during that time were not even audible to spectators
in the courtroom; and

(3) that the closure was a partial one [that encompassed only
members of the defendant's family], and not a total exclusion of
all spectators."

*Id*. at 411.

Moreover, courts have placed considerable emphasis on the role of the
trial judge in assessing whether a closure is of constitutional magnitude and
have resisted ascribing to judges the unauthorized actions of courthouse
personnel. The Tenth Circuit has held that a defendant may not mount a
successful Sixth Amendment claim in the absence of "some affirmative act by
the trial court meant to exclude persons from the courtroom." *United States
v. Al–Smadi*, 15 F.3d 153, 154 (10th Cir. 1994); *see also id*. at 154-55 ("The
brief and inadvertent closing of the courthouse and hence the courtroom,
unnoticed by any of the trial participants, did not violate the Sixth
Amendment."). The Fourth Circuit found a bailiff's temporary refusal to allow
members of the public into the courtroom "entirely too trivial to amount to a
constitutional deprivation" when it "existed for but a short time and was
quickly changed by the Court, when advised of the action of the bailiff."
*Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975).

*United States v. Greene*, 431 F. App'x 191, 195-96 (3d Cir. 2011)

Here, the alleged exclusion of the affiants – during jury selection – was limited in

duration, and there is no record evidence that the scope of the alleged exclusion went beyond

the affiants. Thus, the alleged exclusion was unlikely to jeopardize the aims served by the

public trial guarantee. *See, e.g.*, *Peterson*, 85 F.3d at 43-44; *Braun*, 227 F.3d at 919-20;

*Kelly*, 195 Md. App. 403, 6 A.3d at 411. Further, as noted, there is no evidence that the

alleged exclusion was ordered, known, or ratified by the trial judge. Thus, the alleged

exclusion of the affiants should not be imputed to the court. As also noted, Capshaw never

raised an objection about the alleged exclusion before adding this claim in the amendment to his § 2255 motion – after his case had passed through the entire direct-review process.

The undersigned agrees that the Supreme Court did not intend the holding of *Presley* to be extended to unilateral actions of limited scope allegedly taken by unnamed court security personnel, about which the trial judge was unaware. The alleged closure here was trivial. A trivial closure does not violate the Sixth Amendment. *See Gibbons*, *supra*; *Peterson, supra*. Thus, there was no error of constitutional proportions and no basis to afford Capshaw a new trial premised upon the de minimus exclusion.

## IV.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the 28 U.S.C. § 2255 motion filed by Capshaw be DENIED with prejudice.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **May 26, 2014**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 12th day of May, 2014.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE